UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LYNN WOODLEY,

               Plaintiff,

    – *against* –

THE CITY OF NEW YORK, HARLEM
HOSPITAL CENTER AUXILIARY,
INC., NEW YORK CITY HEALTH
AND HOSPITALS CORPORATION
D/B/A NYC HEALTH + HOSPITALS,
APRIL JOHNSON, *and* NICOLE
PHILLIPS,

               Defendants.

**OPINION & ORDER**

24-cv-04864 (ER)

RAMOS, D.J.:

       Lynn Woodley filed this action alleging disability discrimination and retaliation while working as a clerical associate at Harlem Hospital Center Auxiliary, Inc. ("Harlem Hospital"), which is operated by the New York City Health and Hospitals Corporation ("HHC"). Doc. 21. The City of New York now moves to dismiss the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 30. For the reasons set forth below, the motion is GRANTED with respect to all defendants.[1]

---

[1] *Sua sponte* dismissal of the complaint with respect to all defendants is appropriate in this case, because the federal "issues concerning" Harlem Hospital and the New York City Health & Hospitals Corporation "are substantially the same as those concerning" the City of New York; and with the federal claims dismissed, the state and city law claims are best left for resolution in state court. *Hecht v. Commercial Clearing House, Inc.*, 897 F.2d 21, 26 n.6 (2d Cir. 1990); *see Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 33, 39 (2025) (explaining that "with any federal anchor gone, supplemental jurisdiction over the residual state claims disappears as well," and holding that when a plaintiff amends a complaint to excise the federal claims, leaving the complaint with only state claims, the plaintiff "divests the federal court of adjudicatory power").

## I.     BACKGROUND

### A.  Inciting Events of Woodley's PTSD

Woodley began working as a clerical associate at Harlem Hospital in 1986.  Doc. 21 ¶ 22.  She still held that position in 2019, carrying out duties including but not limited to patient outreach, records maintenance, and data entry.  *Id.* ¶¶ 23, 25.  Throughout her tenure, she worked not only at the front desk but also at other "stations" across various departments of Harlem Hospital.  *Id.* ¶ 25.

Beginning in April 2019, Woodley was stationed at the front desk of the Medical Specialty and Medicine department of ambulatory care, where her duties included distributing MetroCards to qualifying patients.  *Id.* ¶ 26.  On April 3, 2019, she was confronted at the desk by an unknown man.  *Id.* ¶ 27.  In response to being denied a MetroCard, the man shouted profanities at Woodley, making her fear for her safety and causing her to retreat to another area.  *Id.* ¶¶ 30–32.

Woodley saw the man again approximately two months later, on June 28, 2019. *Id.* ¶ 37.  After she checked him in, he verbally accosted her again, shouting profanities and complaining about how long he had to wait.  *Id.* ¶¶ 40–41.  A nurse and a Harlem Hospital Community Liaison both intervened to protect Woodley.  *Id.* ¶ 42.  After this second encounter, Woodley's sense of security at work began to decline sharply.  *Id.* ¶ 47.

A third encounter took place on July 17, 2019, when Woodley noticed the man standing in the waiting area of the ambulatory care department.  *Id.* ¶ 49.  He called her a "bitch," laughed, and left—leading Woodley to believe he did not need care but, allegedly, came only to accost her.  *Id.* ¶¶ 51–52.  Later that day, Woodley reported this string of incidents to her supervisor, Blondine Assomou.  *Id.* ¶ 54.  A few days later, Woodley escalated the matter to Harlem Hospital's police.  *Id.* ¶ 55.  Woodley later learned through Assomou and Harlem Hospital's Commanding Officer, Ronnell Boylan, that there was an open arrest warrant for this man.  *Id.* ¶¶ 56–57.

Weeks after this discovery, the man approached Woodley at Harlem Hospital again, telling her: "I know where you work, what floor to find you, when you come in and out of the building and I will kill you!" *Id.* ¶ 59. He followed Woodley, now escorted by Hospital Coordinating Manager Jasmin Carrington, into the elevator area, continuing to shout at her and repeatedly pressing the elevator buttons to prevent Woodley and Carrington from leaving. *Id.* ¶¶ 63–66. Finally, Carrington managed to stop the man from pressing the buttons and left with Woodley to a different floor. *Id.* ¶ 67. When Woodley was leaving Harlem Hospital at the end of the day, she noticed the man waiting for her across the street. *Id.* ¶ 72. He once again approached Woodley, shouting: "I will kill you, bitch!" *Id.* She reported this incident to Harlem Hospital's police and was informed that threats made off Harlem Hospital's premises were not actionable. *Id.* ¶¶ 73–74. That evening, Woodley emailed Carrington to request a transfer to another department. *Id.* ¶ 76. Carrington promptly replied, informing Woodley that she'd be transferred to the referral unit on the fourth floor effective immediately. *Id.* ¶ 77. Carrington later told Woodley she'd be working there "permanently." *Id.* ¶ 78.

### B. Aftermath

On August 26, 2020, Woodley submitted a doctor's note to Harlem Hospital's Equal Employment Office ("EEO"), requesting to work remotely 3 days per week throughout the COVID-19 pandemic as an accommodation for her asthma. *Id.* ¶¶ 85–86. EEO Regional Director, Nicole Phillips, spoke with Woodley a month later, on September 23, 2020, informing her that her current workstation complied with Woodley's health restrictions because the employees in that department were required to engage in social distancing and wear protective equipment. *Id.* ¶ 87. Woodley also requested a permanent workstation as opposed to a rotation system to limit her exposure to COVID-19; Phillips granted this accommodation on October 14, 2020, but it was set to expire on October 30, 2020. *Id.* ¶¶ 88–89.

3

On October 20, 2020, Woodley was informed that April Johnson would be replacing Carrington as Hospital Coordinating Manager. *Id.* ¶ 90. Johnson offered employees the opportunity to work remotely twice a week and asked employees to submit their preferred days. *Id.* ¶ 91.

Woodley was diagnosed with PTSD on December 1, 2020, stemming from the series of incidents in 2019 discussed above. *Id.* ¶ 98. Woodley informed Johnson of the diagnosis and also mentioned that her previous supervisor, Carrington, had told her she'd be able to work in the referral unit permanently. *Id.* ¶¶ 99–100. Woodley also informed EEO Director Phillips and submitted medical documents requesting that she be permitted to work from home due to her disability. *Id.* ¶ 101.

In January 2021, Woodley requested to work remotely two days per week to accommodate her disability. *Id.* ¶ 103. Contrary to the prior representation by Carrington, Johnson informed Woodley that she lacked authority to approve such a request. *Id.* ¶ 104. Woodley then submitted a formal accommodation request to Phillips. *Id.* ¶ 105.

In the same month, on January 11, 2021, Johnson assigned Woodley the task of onboarding and training new employees, a task previously handled by Johnson and outside of Woodley's job responsibilities. *Id.* ¶ 106. Woodley informed Johnson that she could not perform those tasks due to union regulations. *Id.* ¶ 109.

Johnson subsequently informed Woodley that the referral unit was being repurposed and its employees relocated to other departments. *Id.* ¶ 112. On February 22, 2021, Woodley was reassigned to work under Assistant Coordinating Manager Cory Clarke. *Id.* ¶ 118. Woodley immediately disclosed her disabilities to Clarke, and Clarke told her to continue working in the referral unit until further notice. *Id.* ¶ 119.

On February 26, 2021, Phillips assessed Woodley's condition and authorized her to work remotely full-time starting on March 1, 2021. *Id.* ¶ 110. Despite the fact that she was authorized to work remotely full-time, Woodley requested to work in-person one day

per week, which Phillips granted. *Id.* ¶ 111. On March 26, 2021, Phillips changed Woodley's accommodation to remote work two days per week. *Id.* ¶ 120.

On April 16, 2021, Clarke instructed Woodley to work in the referral unit, effective April 20, 2021. *Id.* ¶ 120. On April 20, 2021, Johnson encountered Woodley in the referral unit and demanded she leave immediately. *Id.* ¶ 124. Woodley told Johnson that Clarke had told her to work in that location; nevertheless, Johnson directed Woodley to a new location, which was "unclean, unsafe, full of dust, and lacked a working computer or phone which effectively impeded [her] ability to perform her duties and which exacerbated and aggravated [her] asthma condition." *Id.* ¶¶ 125–26. Woodley gathered her things and began walking back from the new location to the referral unit, followed by Johnson who "attempt[ed] to provoke [her] and instigate an argument." *Id.* ¶¶ 127–28. Woodley did not engage in the argument, however. *Id.* ¶ 128. On April 30, 2021, Woodley reported Johnson's conduct to Clarke, Phillips, Chief of Ambulatory Care Dr. Iman Sharif-Session, and union representative Efrain Perez. *Id.* ¶¶ 131–32.

On May 25, 2021, Woodley submitted a letter from physician Dr. Joseph Ament requesting an extension of her accommodation for remote work for an additional four to six months. *Id.* ¶ 133. The letter described her asthma as well as her recently diagnosed PTSD as conditions relevant to her request. *Id.* Woodley re-submitted the same letter on October 29, 2021. *Id.* ¶ 134. From April 2021 to April 2022, Woodley continued to work remotely two days per week. *Id.* ¶ 135. During this time, she was supervised by Clarke, Assistant Manager Leticia Martinez, and Clerical Associate Maria Estrada. *Id.* ¶ 137.

In April 2022, Woodley informed Phillips that she would not be requesting an extension of her remote work accommodation, as she was comfortable returning to in-person work five days per week. *Id.* ¶ 138. Later that month, Johnson was reinstated as Woodley's direct supervisor. *Id.* ¶ 140. Woodley conveyed concern about Johnson's reinstatement to Ambulatory Care Administrator Gwendolyn Robinson, recounting

Johnson's offending conduct and requesting that Martinez remain her direct supervisor. *Id.* ¶¶ 141–43.

Upon resuming her role as Woodley's supervisor, Johnson instructed Woodley to return to the front desk where she had been repeatedly confronted by the hostile patient two and a half years prior in 2019. *Id.* ¶ 144. Woodley, believing HHC's policies forbade sending an employee back to a workstation where they had "incurred workplace violence," reminded Johnson of her PTSD diagnosis and the hostile encounters preceding it. *Id.* ¶¶ 145–46. In late August or early September 2022, Woodley overheard Johnson telling another supervisor that there was "no record in [Woodley's] file restricting [her] from working at the front desk." *Id.* ¶ 147.

On September 22, 2022, Johnson instructed Woodley to cover for a coworker at the front desk during a lunch break. *Id.* ¶ 152. In response, Woodley complained to Johnson in person, advising Johnson of her disability and that being assigned to the front desk would aggravate her symptoms. *Id.* ¶ 153. Johnson "ignored" Woodley's complaint. *Id.* ¶ 154. In response, Woodley memorialized the complaint in an email. *Id.* ¶¶ 155–56. Johnson replied that she had no "reasonable accommodations on file" indicating that Woodley could not fulfill any of the duties of a Clerical Associate, which included working at the front desk. *Id.* ¶ 157.

That day, Woodley reported Johnson's behavior to Eugene Torriente, the Harlem Hospital Police Assistant Director, who told her to seek assistance from Harlem Hospital police's main office and request a police patrol at her workstation. *Id.* ¶ 162. Torriente commented that asking an employee to remain at a workstation where they incurred workplace violence was "unheard of." *Id.* ¶ 168. Even after an officer was assigned to patrol the area, Woodley remained "uneasy" at her workstation. *Id.* ¶ 167.

Later on September 22, 2022, and again on September 30, 2022, Woodley called Phillips to report Johnson's conduct. *Id.* ¶¶ 169–71. Phillips suggested Woodley provide her with an updated medical note from her physician so that she could take further action.

*Id.* ¶ 172.  On September 26, 2022, Woodley also emailed Supervisor Jennifer Ruiz, to discuss the 2019 incidents.  *Id.* ¶ 173.  Ruiz forwarded the email to Johnson and Leticia Martinez.  *Id.* ¶ 174.  Later that day, Johnson replied to Woodley's email, stating that the referral unit where Woodley used to work had since been dismantled and that she was expected to work in patient contact areas as part of her position, given there was no accommodation on file prohibiting such an assignment.  *Id.* ¶ 175.

On September 27, 2022, Woodley contacted Dr. Sharif-Session, Harlem Hospital's CEO Georges Leconte, and Director of Hospital Police Kevin Joseph, attaching Johnson's email from the day prior and stating that she could not return to the front desk.  *Id.* ¶ 181.  When they met, Leconte told Woodley to contact Human Resources for further assistance on the matter.  *Id.* ¶ 183.

On October 4, 2022, "after unsuccessful attempts to resolve the issue through multiple channels," Woodley submitted another request for accommodation to the EEO. *Id.* ¶ 184.  The following day, Phillips responded, requesting Woodley provide:  an "explanation of what it is about working [at] a front desk … and interacting with patients that is inconsistent with [her] conditions and/or exacerbates them"; a "clarification as to whether the anticipated duration of [her] conditions is permanent, temporary or unknown"; and a "description of what kind of assignment [her] provider believes would be consistent with [the] restrictions."  *Id.* ¶ 186.  On October 31, Woodley emailed an updated report to Phillips from her new psychiatrist, Dr. Richard Hoetzel.  *Id.* ¶ 187.  On November 9, 2022, she sent Phillips another medical report from her family doctor, Dr. Joseph Ament.  *Id.* ¶ 188.  Both reports recounted the 2019 incidents and Woodley's resulting "permanent trauma" and requested Woodley be permanently placed in a role "that would not aggravate her mental and medical conditions."  *Id.* ¶ 189.

On December 18, 2022, Phillips informed Woodley that "[her] request to be assigned to a non-patient facing position in another department cannot be approved

because [the EEO] Office has determined that granting such a request is unreasonable and/or would create undue hardship." *Id.* ¶ 190.

On December 23, 2022, Johnson assigned Woodley to work at the front desk. *Id.* ¶ 194. Woodley initially protested but, "[d]ue to fear of further retaliation," eventually complied. *Id.* ¶¶ 195–96. To Woodley's knowledge, the man who repeatedly confronted her in 2019 was still a patient at Harlem Hospital during this time. *Id.* ¶ 199. Ruiz intervened and directed Woodley to work in a cubicle on referral tasks, but when Johnson observed Woodley working in the cubicle, she instructed her to return to the front desk. *Id.* ¶ 200. Ruiz later spoke with Johnson, and Johnson remarked that she "couldn't understand why [Woodley] was experiencing anxiety attacks, insisting there was nothing to be afraid of at the front desk area." *Id.* ¶ 204. Woodley requested to leave early that day "due to her worsening mental health," which Johnson denied. *Id.* ¶ 205. Johnson then instructed Ruiz to leave early, "ensuring [Woodley] remained alone at the front desk." *Id.* ¶ 206.

On December 26, 2022, Woodley contacted Phillips, requesting reassignment to a position "which did not require [her] to be at the front desk." *Id.* ¶ 207. On December 27, 2022, "driven by the aggravation of her disability to the extent she feared returning to work due to the discriminatory and hostile actions she was subjected to by [] Johnson," Woodley "was forced to take medical leave." *Id.* ¶ 208.

On January 9, 2023, Woodley contacted Leconte, requesting to meet to discuss her concerns surrounding her treatment at work. *Id.* ¶ 209. In the meeting, Leconte again encouraged Woodley to contact Human Resources. *Id.* ¶ 210.

On January 11, 2023, Dr. Hoetzel diagnosed Woodley with adjustment disorder, "a condition caused by anxiety, depression, overall shock, and stress." *Id.* ¶ 211.

On January 18, February 1, and February 14, 2023, Woodley emailed Phillips about job openings at "parallel HHC institutions, which avoided public interaction." *Id.* ¶¶ 214–15. Phillips did not reply to any of Woodley's emails. *Id.* ¶ 216. On March 13,

2023, Woodley emailed Phillips requesting information on vacancies and advised Phillips that she was out on medical leave on account of her disability but sought assistance returning to work. *Id.* ¶ 217.  Phillips "outright ignored [Woodley's] requests." *Id.* ¶ 220.

On April 4, 2023, the EEO denied Woodley's request for accommodation "without any interactive discussion." *Id.* ¶ 225.  Woodley believes the denial was "directly ordered" by Johnson and Phillips. *Id.* ¶ 226.  During several subsequent meetings, on March 8, May 3, July 12, September 6, and November 8, 2023, Woodley reminded Phillips and Johnson of her PTSD diagnosis. *Id.* ¶ 231.  On November 30, 2023, Woodley spoke with EEO Representative Sabrina Joslyn, who stated she had contacted Johnson and Phillips again and was waiting for them to get back to her. *Id.* ¶ 232.

Woodley has not returned to work since December 27, 2022. *Id.* ¶ 233.  Woodley filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), dual filed with the State of New York, on January 5, 2024. *Id.* ¶ 239.  Harlem Hospital terminated Woodley's employment on January 30, 2024, citing a "legitimate non-discriminatory reason" that was allegedly "merely pretextual" given the "temporal proximity" to Woodley's EEOC filing. *Id.* ¶¶ 242–46.

### C.  Procedural History

Woodley received a notice of the right to sue from the EEOC on March 28, 2024, and filed the original complaint on June 26, 2024. *See generally* Doc 1; Doc. 21 ¶ 6.  The complaint named the City of New York, Harlem Hospital, the New York City Health & Hospitals Corporation, Johnson, and Phillips as defendants, and asserted claims under the Americans with Disabilities Act ("ADA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). *See generally* Doc. 21.  She filed an amended complaint on December 19, 2024, asserting ten claims including:  (1) discrimination under the ADA, NYSHRL, and NYCHRL, (2) retaliation

under the ADA and NYSHRL, and (3) aiding and abetting under the NYSHRL and NYCHRL.  Doc. 21 ¶¶ 257–80, at 33–34.

The City of New York filed a motion to dismiss on February 14, 2025, Doc. 30, arguing principally that Woodley failed to state causes of action pursuant to any of the applicable laws.  *See generally* Doc. 31.  Among other arguments, the City contends that Woodley does not qualify as disabled within the meaning of the ADA, because the ADA defines a disability as a "physical or mental impairment that substantially limits one or more major life activities," and Woodley has only claimed an inability to work at a particular location, the front desk where she was verbally assaulted in 2019.  *Id.* at 19. The City also argues that Woodley's claims are at least partially time-barred, on the basis that she did not file her complaint within 90 days of receiving a right-to-sue letter from the EEOC and that many of the events allegedly constituting discrimination and retaliation occurred over 300 days before the complaint was filed.  *Id.*  Finally, the City argues it is not a proper defendant.  *Id.*

Woodley filed a response on March 25, 2025, clarifying that she did submit her complaint within 90 days of receiving the right-to-sue letter (as the City subsequently acknowledged, Doc. 52 at 6 n.1).  Doc. 38 at 4–5.  Further, she argues that the discrimination and retaliation causes of action were timely pursuant to the continuous violation doctrine, based on a hostile work environment theory—despite the fact that Woodley never asserted a hostile work environment claim in the complaint.  *Id.* at 5–6. She also disputes the City's argument that it is not a proper defendant in the matter.  *Id.* Finally, she challenges the City's characterization of her disability, contending that she qualifies as disabled within the meaning of all of the applicable laws because her PTSD substantially limited her ability to perform any "patient-contact" role.  *Id.* at 9.  The City submitted a reply on May 30, 2025, disputing the applicability of the continuous violation doctrine and reiterating its initial arguments.  *See generally* Doc. 52.

## II.    LEGAL STANDARD

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 680.

The question in a Rule 12 motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits'" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

III.    **DISCUSSION**

    **A. Applicability of the Continuous Violation Doctrine**

    A "continuing violation" may exist in the context of an ADA or NYSHRL claim "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the [defendant] to continue unremedied for so long as to amount to a discriminatory policy or practice." *Purcell v. New York Institute of Technology*, 931 F.3d 59, 65 (2d Cir. 2019) (internal citation omitted). The doctrine may apply to a NYCHRL claim where the alleged events are the "result of a discriminatory policy or practice." *Taylor v. City of New York*, 207 F. Supp. 3d 293, 303 (S.D.N.Y. 2016).

    The Court finds that the continuing violation doctrine does not apply in this case, because Woodley failed to state either (1) a hostile work environment claim or (2) that the defendants' alleged conduct was in furtherance of a discriminatory or retaliatory policy or practice. First, the Court is not required to consider Woodley's assertion of a hostile work environment in her opposing brief, Doc. 38 at 5–6, since a "party may not use his or her opposition to a dispositive motion as a means to amend the complaint." *Shah v. Helen Hayes Hospital*, 252 F. App'x 364, 366 (2d Cir. 2007). Second, the facts alleged in the complaint could not support a reasonable inference that Woodley's supervisors engaged in a discriminatory or retaliatory policy or practice.

    This case is controlled by *Purcell*, in which the Second Circuit found that the continuing violation doctrine did not apply where the alleged discriminatory events were separated by a "significant passage of time"—almost two years, in that case—and there was a lack of overlap between the plaintiff's alleged harassers. 931 F.3d at 65. Notably, the Court in *Purcell* established that the consistent involvement of one individual throughout offending events did not constitute sufficient "overlap" to support a continuing violation theory. *Id.*

In the instant case, there is a considerable passage of time during which no offending events occurred—April 2021 to April 2022—and most of the alleged offending events involved only Johnson.  Doc. 21 ¶ 135.[2]

In addition, the allegations in Woodley's complaint reflect a series of discrete acts, which cannot form the basis of a continuing violation under the ADA.  *See generally* Doc. 21.  The continuous violation doctrine applies to ADA claims "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the defendant to continue unremedied for so long as to amount to a discriminatory policy or practice," *Purcell*, 931 F.3d at 65, but does not apply to ADA claims based on "discrete unlawful acts, even where those discrete acts are part of a serial violation[]." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (internal quotation marks and citation omitted).

The amended complaint never alleges that the conduct Woodley faced was done in furtherance of or pursuant to a discriminatory or retaliatory policy or practice, and the conduct alleged could not support a reasonable inference thereof.  The conduct attributed to Johnson consists of the discrete acts of assigning Woodley to work at the front desk on three separate occasions and speaking harshly to or about Woodley—and "negative or otherwise insulting statements are hardly even actions, let alone adverse actions." *Dixon v. City of New York*, No. 23-cv-8941 (JGK), 2025 WL 50140, at *19 (S.D.N.Y. Jan. 7, 2025) (citation omitted).

Therefore, the continuous violation doctrine is inapplicable, and the only timely acts alleged by Woodley are those occurring after March 11, 2023—300 days before January 5, 2024, when Woodley filed a charge of discrimination with the EEOC.  Doc. 21 ¶ 239.

---

[2] Although Woodley alleges that the unidentified man who harassed her in 2019 contributed to the hostile work environment, those events are even more remote—having occurred almost five years before Woodley filed the original complaint.  Doc. 38 at 6–7.

### B.  Woodley's Disability Status Under the ADA

The ADA defines a disability to include "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1).  Major life activities include "performing manual tasks, seeing, hearing . . . and working." § 12102(2)(A).  When the relevant major life activity is working, a plaintiff "must show that the limitation affects the ability to perform a class . . . or broad range of jobs."  *Woolf v. Strada*, 949 F.3d 89, 94 (2d Cir. 2020) (emphases and citation omitted).  An "'inability to perform a single, particular job does not constitute a substantial limitation.'" *Greenbaum v. New York City Transit Authority*, No. 21-1777, 2022 WL 3347893, at *2 (2d Cir. Aug. 15, 2022) (quoting *Woolf*, 949 F.3d at 94).

The amended complaint does not allege facts raising a reasonable inference that Woodley is disabled within the meaning of the ADA.  Throughout the complaint, Woodley never alleges an inability to perform a "class" or "broad range" of jobs.  *See generally* Doc. 21.  Indeed, the complaint clarifies that Woodley "never specifically requested or stated she could [not perform any patient-facing job], just that the front desk posed issues because it was the very place she was assaulted."  Doc. 21 ¶ 177. Furthermore, the Court is not required to credit the "expound[ed]" description of her impairment,[3] provided for the first time in Woodley's brief in opposition, Doc. 38 at 9, since a "party may not use his or her opposition to a dispositive motion as a means to amend the complaint."  *Shah*, 252 F. App'x at 366.

In accordance with the Court's finding that Woodley does not qualify as disabled under the ADA, the ADA claims are DISMISSED.

### C.  Woodley's Remaining Claims

Having dismissed Woodley's ADA claims—the only federal claims—the Court declines to adjudicate the NYSHRL and NYCHRL claims remaining.  *See Royal Canin*

---

[3] For example, in her opposition, Woodley claims that her disability precluded her from working in *any* "patient contact roles"—not only the front desk where she was accosted by a hostile patient in 2019.  Doc. 38 at 9.

14

*U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 33, 39 (2025) (explaining that "with any federal anchor gone, supplemental jurisdiction over the residual state claims disappears as well," and holding that when a plaintiff amends a complaint to excise the federal claims, leaving the complaint with only state claims, the plaintiff "divests the federal court of adjudicatory power"); *see also Cohen v. Postal Holdings*, LLC, 873 F.3d 394, 404 (2d Cir. 2017) (Calabresi, J. concurring) (noting that "after all federal claims have been dismissed, the default rule is that federal courts should not decide related state–law claims unless there is good reason for doing so"); *Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law … [I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well."). Therefore, Woodley's remaining claims are dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the City's motion to dismiss the ADA claims is GRANTED with respect to all defendants. The NYSHRL and NYCHRL claims are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the motion, Doc. 30, and close the case.

It is SO ORDERED.

Dated:    July 23, 2025
          New York, New York

EDGARDO RAMOS, U.S.D.J.